

IN THE COURT OF CRIMINAL APPEALS
OF TEXAS

NO. WR-90,447-01

Ex parte JAMAKA RAY COTTINGHAM, Applicant

ON APPLICATION FOR A WRIT OF HABEAS CORPUS
CAUSE NO. 744984-A IN THE 176TH DISTRICT COURT
FROM HARRIS COUNTY

KELLER, P.J., filed a concurring opinion in which YEARY and KEEL, JJ., joined.

In agreed findings, the habeas court recommends granting relief on an ineffective assistance of counsel claim because fingerprints on the victim's vehicle connect two individuals other than Applicant to the robbery, because one of those individuals has denied that Applicant was one of the robbers, and because another individual not present at the robbery has said that Applicant was not part of the robbery ring. But there are some loose ends in this case that need to be tied up before we sign off on granting relief. The person denying Applicant's participation declined to sign an affidavit to that effect or to testify, and an affidavit from someone affiliated with the Office of Inspector General (OIG) states this person admitted to him that Applicant did participate in the robbery. The agreed findings do not explain how the habeas court views the OIG affidavit, and the findings appear

to inaccurately describe the individual making the affidavit. Also, the victim was definitive in his identification of Applicant (having encountered him later), and it would be helpful to know whether the fingerprint evidence affects his conclusion that Applicant was one of the robbers. We should also at least try to obtain affidavits or live testimony from the individuals who left the fingerprints. Consequently, I agree with remanding for further investigation and supplemental findings of fact.

## A. Background

According to the findings, the victim was robbed by three individuals, who drove up in a Pontiac. The first individual exited the Pontiac, put a gun to the victim's head, and searched him. The second individual also held a gun and searched the victim's car. The third individual stayed in the Pontiac.

The victim saw the license plate number of the Pontiac and reported that number to the police. The car with that license plate number had been reported as stolen. The car was found by the police less than three days later, wrecked and abandoned. At that time, fingerprints were lifted from the Pontiac, one of which contained sufficient characteristics for identification. An officer asked that this print be compared to Applicant's fingerprints, but ultimately, no fingerprint evidence was introduced at trial.

A month later, the victim encountered Applicant, wearing a dark blue sweatshirt that was "probably" the same as the one worn by the second robber during the robbery. They made eye contact, and Applicant looked "stunned and surprised." The victim later identified Applicant in court and testified that there was no doubt in his mind, that he was 300% positive, that Applicant was the second robber.

Applicant's twenty-three-year-old sister provided an alibi for Applicant, but it was not

airtight. She testified that he was at home from 6:30 p.m. to 10:30 p.m. on the date of the robbery but admitted that he could have left and returned while she was not paying attention.

Subsequent investigation has determined that the fingerprint that was lifted belonged to Marty Richard Duran. Further investigation revealed other prints on the car belonging to Duran and Brisby Brown. Duran admitted to habeas counsel that he had used the Pontiac in various robberies, including the victim's robbery. He named Brisby Brown as one of his accomplices during the victim's robbery. However, he denied knowing Applicant and said that Applicant did not participate in the victim's robbery. Kenneth Hadnot, who described himself as the leader of the robbery ring, told habeas counsel that he instructed Duran to rob the victim because of a disagreement over money the victim owed him. Hadnot stated that the group of robbers was a tight-knit group, that he did not know Applicant, and that he was "as certain as he could be," without having been there, that Applicant would not have been part of the robbery.

In a footnote, the habeas court's findings refer to an affidavit of Daniel Briseno. The habeas court states, "Twelve years after Duran made this statement to habeas counsel, a TDC prison guard asserted that Duran said that [A]pplicant was involved in the [victim's] robbery but was not a gunman and that Duran would not testify to the same." A review of the affidavit in the habeas record reveals that it purports to be the statement of "Daniel Briseno Criminal Investigator OIG." The heading at the top of the affidavit states, "Texas Department of Criminal Justice Office of Inspector General." The affidavit states:

> On October 11, 2018, at 1145 hrs., while escorting Offender Marty Duran # 201137, back into the unit after being finger printed I asked Offender Duran why he was being finger printed. Offender Duran stated he was being finger printed to help out (unsure of name but sounded like) Jamica Cunningham. Offender Duran stated when he was younger he was in a car with the named person during a robbery. Offender Duran

stated they [sic] the cops found the named person and that he (Duran) got away with the robbery. I asked Offender Duran if the named person was actually with him during the robbery and Offender Duran stated the named person was. Offender Duran stated his time was over and that he was just trying to help someone out. Offender Duran stated he was giving his finger prints but was not going to testify and again stated the named person was present during the robbery. Offender Duran stated the named person was not the gun man but he was there.

## B. Analysis

The habeas court cites the Briseno affidavit but does not address it substantively. The court does not say whether the affidavit is credible, nor does it say what affect the affidavit has on its findings. And the habeas court appears to erroneously characterize the affiant as a prison guard, when it appears that he was a criminal investigator with the OIG. As it stands, the court's finding in that regard does not appear to be supported by the record.

This affidavit brings Duran's credibility into serious question, and it directly controverts the claim he made to habeas counsel that Applicant was not one of the robbers. On the other hand, if Hadnot and the victim knew each other, then there might be more to this case than the victim has let on. Or Hadnot might be lying about knowing the victim. If the robbery ring was a "tight-knit" group, then Hadnot and Duran might both have reasons to falsely exculpate Applicant.

Sworn testimony, live or by affidavit, from the victim would be helpful on the issues of whether he knew Hadnot and whether he would still be certain of his identification of Applicant in light of the fingerprint evidence and the statements made by Duran and Hadnot. Likewise, sworn testimony from Duran and Hadnot would be helpful in assessing the credibility of their statements to habeas counsel. If they are unwilling to make such statements under penalty of perjury, that would reflect on their credibility. And Duran could be confronted with the OIG affidavit and asked to explain or deny the statements attributed to him. The habeas court could then assess this additional

information, along with the OIG affidavit, and determine whether that impacts its findings, conclusions, and ultimate recommendation.

One of the dissents suggests that Duran, at least, would invoke the Fifth Amendment right against self-incrimination if bench-warranted to testify under oath. If any member of the crime ring is unwilling to testify, why should we believe his testimonial, hearsay statements? The existence of someone else's fingerprints on the getaway vehicle does not, by itself, cast doubt on Applicant's involvement in the crime. As the victim himself testified, three individuals were involved in the robbery. What might exculpate Applicant is that the fingerprints lead to individuals who now say that Applicant was not involved. But none of these individuals has given sworn testimony to that effect. We have only statements made by these individuals to habeas counsel.

As the Court's opinion explains, even when the State and the trial court agree that relief is warranted, the record may sometimes be insufficient and require a remand for further development.[1] This appears to be one of those times. The dissents seek to rush the process, even though there is no sworn testimony from the people who purport to exculpate Applicant. The State's agreement to grant relief does not mean that we should overlook the obvious problems that this record presents. As the "ultimate factfinder," we are not required to defer to the trial court when its findings do not appear to be supported by the record,[2] nor should we adopt a rule that we will automatically defer to the State when it recommends granting relief without record support for doing so. Not only would such a rule be contrary to caselaw,[3] but it would conflict with habeas corpus being an extraordinary

---

[1] *Ex parte Turner*, 394 S.W.3d 513, 513-14 (Tex. Crim. App. 2013).

[2] *Ex parte Reed*, 271 S.W.3d 698, 727 (Tex. Crim. App. 2008).

[3] *See supra* at n.1.

remedy grounded in equity.[4]  We have, for example, held that this Court may sua sponte raise the issue of laches, even if not raised by the State.[5]  At this point, all we are doing is remanding for further information.  Given society's interest in punishing those who have actually committed crimes and in the finality of convictions, we ought to at least have a better record before us than we do now before we grant relief.

I join the Court's remand order.


Filed: October 7, 2020

Publish

---

[4]  *See Ex parte Smith*, 444 S.W.3d 661, 666 (Tex. Crim. App. 2014) ("'[T]he writ of habeas corpus is an extraordinary remedy, any grant of which must be underscored by elements of fairness and equity.'  To determine whether equitable relief should be granted then, it behooves a court to determine whether an applicant has slept on his rights and, if he has, whether it is fair and just to grant him the relief he seeks.  The expanded approach ensures that courts keep, at the fore, the State's and society's interest in the finality of convictions, and consider the trial participants' faded memories and the diminished availability of evidence.").

[5]  *Id.* at 667.